# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | |
|---|---|
| **TONY K. MARTIN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No.: 3:11-CV-3547-VEH |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **ACTING COMMISSIONER** | ) |
| **SOCIAL SECURITY** | ) |
| **ADMINISTRATION,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION[1]

Plaintiff Tony K. Martin ("Mr. Martin") brings this action under 42 U.S.C. § 405(g) (2006), Section 205(g) of the Social Security Act. He seeks review of a final adverse decision of the Commissioner of the Social Security Administration ("Commissioner"), who denied his application for Disability Insurance Benefits

---

[1]The court recently became aware that Carolyn W. Colvin was named the Acting Commissioner of the Social Security Administration on February 14, 2013. *See* http://www.socialsecurity.gov/pressoffice/factsheets/colvin.htm ("On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.") (last accessed on Mar. 13, 2013). Under 42 U.S.C. § 405(g), "[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office." Accordingly, pursuant to 42 U.S.C. § 405(g) and Rule 25(d) of the Federal Rules of Civil Procedure, the court has substituted Carolyn W. Colvin for Michael Astrue in the case caption above and **HEREBY DIRECTS** the clerk to do the same party substitution on CM/ECF.

("DIB"). Mr. Martin timely pursued and exhausted his administrative remedies available before the Commissioner. The case is thus ripe for review under 42 U.S.C. § 405(g).

## FACTUAL AND PROCEDURAL HISTORY

Mr. Martin was forty-five years old at the time of his hearing before the Administrative Law Judge ("ALJ"). (Tr. 35). He has completed high school and four years of college. (*Id.* ). His past work experiences include employment as a systems accountant and systems analyst. (Tr. 25 ). He claims he became disabled on March 14, 2008, due to bipolar disorder and the symptoms associated with that condition. (Tr. 16). His last period of work ended on that date as well. (*Id.*).

On March 31, 2008, Mr. Martin protectively filed a Title II application for a period of disability and DIB. (Tr. 14). On May 16, 2008, the Commissioner initially denied these claims. (*Id.*). Mr. Martin timely filed a written request for a hearing on May 28, 2008. (*Id.*). The ALJ conducted a video hearing on the matter on December 8, 2009. (*Id.*). On February 4, 2010, he issued his opinion concluding Mr. Martin was not disabled and denying him benefits. (Tr. 26). Mr. Martin timely petitioned the Appeals Council to review the decision on April 5, 2010. (Tr. 219). On August 26, 2011, the Appeals Council issued a denial of review on his claim. (Tr. 1).

Mr. Martin filed a Complaint with this court on October 3, 2011, seeking

review of the Commissioner's determination. (Doc. 1). With the parties having fully briefed the matter, the court has carefully considered the record and reverses the decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). This court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

This court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions de novo because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has

been conducted, it must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## **STATUTORY AND REGULATORY FRAMEWORK**

To qualify for disability benefits and establish his or her entitlement for a period of disability, a claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.[2] The Regulations define "disabled" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence about a "physical or mental impairment" which "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.

The Regulations provide a five-step process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The Commissioner must determine in sequence:

---

[2]The "Regulations" promulgated under the Social Security Act are listed in 20 C.F.R. Parts 400 to 499, revised as of April 1, 2007.

(1)  whether the claimant is currently employed;
(2)  whether the claimant has a severe impairment;
(3)  whether the claimant's impairment meets or equals an impairment listed by the Commissioner;
(4)  whether the claimant can perform his or her past work; and
(5)  whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993) (citing to formerly applicable C.F.R. section), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 562-63 (7th Cir. 1999); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

The sequential analysis goes as follows:

> Once the claimant has satisfied steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her work, the burden shifts to the [Commissioner] to show that the claimant can perform some other job.

*Pope*, 998 F.2d at 477; *accord Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The Commissioner must further show that such work exists in the national economy in significant numbers. *Id.*

## FINDINGS OF THE ADMINISTRATIVE LAW JUDGE

The ALJ here found that Mr. Martin met the insured status requirements of the Social Security Act through December 31, 2013. (Tr. 16). He also found that Mr. Martin had not engaged in substantial gainful activity since March 14, 2008, the alleged onset date of his disability. (*Id.*). He further concluded that Mr. Martin had

bipolar disorder, which qualifies as a severe impairment. (*Id.*). The ALJ then held that this medically determinable impairment did not meet or medically equal one of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations. (Tr. 21).

After considering the entire record, the ALJ found that Mr. Martin had the residual functional capacity ("RFC") to perform a "full range of light work at all exertional levels but with the following non-exertional limitations: unskilled work requiring repetitive work-related activities and involving no more than occasional interaction with supervisors, coworkers, and the general public." (Tr. 22). In reaching this determination, the ALJ discredited Mr. Martin's articulation of the limiting effects his disorder placed on his abilities. (Tr. 23). He also "did not credit, to any great extent" the assessments made of Mr. Martin by his treating physicians: Dr. Hugh Sharp IV, M.D., Dr. Martha E. Baker, Psy.D, Dr. H. Lee McDaris, Jr., M.D., and Dr. Tarak Vasavada, M.D. (*Id.*). He found their respective evaluations inconsistent with the activity level maintained by Mr. Martin after their diagnoses and with the Global Assessment of Functioning ("GAF") scores that Mr. Martin had received on more than one occasion. (Tr. 23-24). In turn, the ALJ gave "some weight" to the RFC conclusion reached by the non-examining physicians employed by the State Disability Determination Services agency. (Tr. 24).

6

He then found that Mr. Martin was unable to perform any past relevant work. (Tr. 25). He further concluded that Mr. Martin was forty-four years old on the alleged disability date, had at least a high school education, and was able to communicate in English. (*Id.*). He decided that "transferability of job skills [was] not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant [was] 'not disabled,' whether or not the claimant [had] transferable skills." (*Id.*). When considering Mr. Martin's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Mr. Martin could perform. (*Id.*). In reaching this conclusion, he relied on the testimony of a vocational expert, Ms. Barbara Azzam. (Tr. 14). Ms. Azzam testified that a person with Mr. Martin's profile could perform the requirements of representative occupations such as assembler, inspector, and account clerk. (Tr. 26). She further vouched that jobs in such occupations existed both regionally and nationally. (*Id.*).

Relying on these determinations, the ALJ found that Mr. Martin was not disabled under the Social Security Act from March 14, 2008, through February 4, 2010, the date of the decision. (*Id.*). He thus rejected his application for DIB. (*Id.*).

## ANALYSIS

**I.     INTRODUCTION**

The court may only reverse a finding of the Commissioner if it is not supported by substantial evidence. 42 U.S.C. § 405(g). "This does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)).[3] However, the court "abstains from reweighing the evidence or substituting its own judgment for that of the [Commissioner]." *Id.* (citation omitted).

Mr. Martin urges this court to reverse the Commissioner's decision to deny his benefits on two grounds: (1) the ALJ wrongly rejected the opinion evidence provided by Mr. Martin's treating physicians and (2) the ALJ erred in failing to consider whether Mr. Martin's chronic migraine headaches constituted a severe impairment. (Doc. 9 at 12). As the court agrees with Mr. Martin's first objection, it does not address the latter.

## II. THE ALJ INCORRECTLY APPLIED THE LEGAL STANDARD FOR DISCREDITING THE OPINIONS OF TREATING PHYSICIANS.

The ALJ wrongly discounted the various assessments of Mr. Martin's functional capacity provided by his treating physicians. The opinion of a treating

---

[3]*Strickland* is binding precedent in this Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

8

physician "must be given substantial or considerable weight unless good cause is shown to the contrary." *Phillips v. Barnhard*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotation marks omitted). "Good cause" exists when (1) the treating physician's opinion was not bolstered by the evidence, (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.* at 1241 (citation omitted). The ALJ must clearly articulate his or her reasons for disregarding a treating physician's opinion, and the failure to do so is reversible error. *Lewis*, 125 F.3d at 1440; *see also* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). However, when the ALJ adequately states specific reasons for doing so, and those reasons are supported by substantial evidence, there is no such error. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (per curiam).

In this case, Mr. Martin submitted a "Mental Residual Functional Capacity Questionnaire" ("Mental RFC Form") that Dr. Hugh Sharp completed on July 13, 2009. (Tr. 225-229). Dr. Sharp had treated Mr. Martin since January 2005. (Doc. 241). On the Mental RFC Form, Dr. Sharp described Mr. Martin's impairment and symptoms as manifesting itself in "extreme interpersonal sensitivity [,] particularly

9

with regard to [his] marriage." (Tr. 225). Specifically, "conflict results in crying, withdrawal, hopelessness, [and] energia," and the prognosis for improvement in his condition was "poor." (*Id.*). Dr. Sharp further opined that Mr. Martin had "no useful ability" to complete a normal workday and workweek without interruptions from his psychologically-based symptoms. (Tr. 227). Mr. Martin was also "unable to meet competitive standards" in the following areas:

- Maintaining attention for two-hour segments
- Sustaining an ordinary routine without special supervision
- Performing at a consistent pace without an unreasonable number and length of rest periods
- Dealing with normal work stress

(*Id.*). Last, according to Dr. Sharp, Mr. Martin was "seriously limited, but not precluded" from performing the following work-related activities:

- Working in coordination with or in proximity to others without being unduly distracted
- Making simple work-related decisions
- Accepting instructions and responding appropriately to criticism from supervisors
- Responding appropriately to changes in a routine work setting

(*Id.*). Dr. Sharp also believed that Mr. Martin would miss more than four days of work per month due to his medical condition or the need for medical treatment. (Tr. 229). Elsewhere, in an August 2, 2007, letter addressed by Dr. Sharp to Mr. Martin's former employer, Dr. Sharp stated that Mr. Martin "has difficulty maintaining

concentration and focus on highly complex problems at work, particularly when under the pressure of a deadline. When his condition is at its worst, he is essentially bed-bound and unable to leave the house." (Tr. 242).

Mr. Martin's other treating physicians largely echoed this assessment. Dr. Martha Baker, a licensed psychologist, began treating Mr. Martin on February 2, 2006, after Dr. Sharp referred him to her. (Tr. 271). In a document dated October 3, 2007, she opined that the level of stress and working conditions of his then-current position compromised his mental health. (Tr. 271-72). She further noted that high stress levels had repeatedly triggered in Mr. Martin episodes of depression, generalized anxiety, hypomania, and physical illness and that "[t]oo much stress can leave him so depressed that he cannot get out of bed or leave the house." (Tr. 272). In addition to Dr. Baker, Dr. Tarak Vasavada began treating Mr. Martin on January 8, 2007. (Tr. 173). Specifically, he managed the functioning of the Vagus Nerve Stimulator device implanted into Mr. Martin in December 2006 for treatment of his resistant depression. (Tr. 271). In a document dated October 31, 2007, Dr. Vasavada vouched that Mr. Martin's depression was chronic, that he was unlikely to recover, and that he will be disabled for a long time and possibly forever. (Tr. 267). He also diagnosed Mr. Martin with a GAF of 30. (*Id.*). Last, he advised him "not to work, not to take additional stress from extra work, financial dealings, etc." (*Id.*). Finally,

Dr. H. Lee McDaris, Jr., began treating Mr. Martin for headache evaluation and management on July 25, 2007. (Tr. 173). In a letter dated October 30, 2007, he doubted that Mr. Martin's headaches would dissipate in his then-current working conditions. (Tr. 311). He noted, "If stress levels cannot be adequately controlled, or an ideal combination of medications is not found to control this condition, it is my estimation that he is unable to work at this level on a sustained basis." (*Id.*).

As noted, the ALJ chose essentially to disregard these opinions. (Tr. 23). He found their assessments "too restrictive, considering the subsequent activity level that is contained in the medical records subsequent to the claimant's alleged onset of disability." (*Id.*) . He cited the following activities as examples:

- Volunteering at a local Mental Health Association in September 2008
- Acting as treasurer of his children's Parent Teacher Association
- Joining a gym
- Participating in the church choir
- Periodically meeting with a friend for breakfast
- Complaining on April 22, 2008, that he did not seem to have enough time to handle household and yard chores ("implying that he was busy with some undisclosed activities")
- Driving to Birmingham, Alabama, to attend to his daughter's medical needs
- Going on a vacation to Orlando, Florida
- Maintaining a household while his wife works during the day, including driving his children to and from school successfully

(Tr. 24). The ALJ also found that Dr. Sharp's assessment of Mr. Martin clashed with the GAF score of 55 that the doctor simultaneously gave him. (*Id.*). As such a score

"implies only moderate symptoms," the ALJ thought it inconsistent with the severe limitations outlined by Dr. Sharp. (*Id.*). Additionally, he stated, without elaborating, that Dr. Sharp's evaluation "substantially contradicted" the doctor's earlier comments on Mr. Martin. (*Id.*). Finally, citing Mr. Martin's service as a PTA treasurer as an example, the ALJ concluded that the record did not support the claimed incapacitating effects of stress on Mr. Martin. (*Id.*). Instead, Dr. Sharp's assessment "appears to be designed more to help the claimant obtain medical benefits rather than to constitute an objective assessment of the claimant's actual limitations and restrictions . . ." (*Id.*). In his brief before the court, the Commissioner largely reiterated the ALJ's reasoning in defending his ultimate decision. (*See* Doc. 11 at 9-12).

These arguments do not qualify as "good cause" to disregard the congruous medical opinions of Mr. Martin's four treating physicians. The Commissioner implicitly admits that the physicians' collective medical assessment of Mr. Martin, if fully credited, would support the conclusion that he was "disabled" under the Social Security Act during the claimed eligibility period. Therefore, in order to meet the "good cause" standard, the Commissioner must show that the doctors' opinions were either not bolstered by the evidence, conclusory, or inconsistent with their own medical records. *Phillips*, 357 F.3d at 1241 (citation omitted). He argues the first

13

and third points, but he fails to make his case. Specifically, none of the activities he identifies undermine a diagnosis of psychological incapacity. Mr. Martin's treating physicians variously opine that he is no longer able to handle the stress, goal-oriented thinking, time management responsibility, and interpersonal relationships that necessarily attend gainful employment. The daily living activities enumerated by the ALJ – volunteering, running errands, exercising, driving, doing chores, etc. – simply do not undercut such an assessment. In fact, the ALJ did not attempt to substantiate his claim that they did so in any detail. While he did identify the "duties and pressures of being a PTA treasurer" and the responsibilities that such a position would entail, he failed to infer that Mr. Martin's resignation from that position subverted his own assessment. (*See* Tr. 24, 42-43). Additionally, Mr. Martin persuasively argues that the part-time responsibilities of being a volunteer PTA treasurer do not equate to those of a full-time employee. (Doc. 9 at 9). Apart from this example, the ALJ simply did not explain how any of the other listed activities refuted a diagnosis of mental disability.

The other reasons the ALJ marshaled for discounting the opinion evidence of Mr. Martin's four treating physicians are similarly unconvincing. As noted, he cited Dr. Sharp's conferral of the relatively moderate GAF score of 55 on Mr. Martin in the Mental RFC Form the doctor completed on May 28, 2008. (Tr. 24, 424). Such an

observation ignores the dynamic nature of bipolar disorder.  (*See* Doc. 12 at 5) ("GAF scores can very widely in a short period of time and among medical providers."). Because of his condition, Mr. Martin alternates between episodes of mania, hypo-mania, depression, and (relative) normality. (*See generally* Tr. 152-171). He admits that he can be comparatively functional at times. (*Id.*). The fact that he received a GAF score of 55 at a certain point (or points) in his treatment is thus unsurprising and insufficiently conclusive to undermine the diagnoses of several treating physicians. Moreover, the ALJ failed to mention that Dr. Vasavada had given Mr. Martin the more dire GAF score of 30 on October 31, 2007. (Tr. 267).

The court may also dismiss the ALJ's observation that Dr. Sharp's assessment in his 7/13/09 Mental RFC Form varied from his earlier evaluation of Mr. Martin. The ALJ did not elaborate on the nature of this departure; he referenced Dr. Sharp's earlier GAF score as if it were sufficient to prove a fatal contradiction in the record. Even assuming that the ALJ has proven a legitimate inconsistency, such a discrepancy does not rise to the level needed to override a treating physician's opinion (much less the accordant opinions of four treating physicians). Where medical evidence does not *conclusively* counter a treating physician's opinion, and no other good cause is presented, the Commissioner cannot discount that doctor's opinion. *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1981) (emphasis added).

This holding especially applies where, as here, the ALJ decided to credit instead the opinion of non-examining physicians. (Tr. 24); *see also Hillsman v. Bowen*, 804 F.2d 1179, 1182 (11th Cir. 1986) ("This court has previously cautioned against rejecting the opinions of treating physicians in favor of the contrary conclusions of consultants who have merely examined an applicant's medical records.") (citation omitted).

With these observations in mind, the court finds that ALJ incorrectly decided to "not credit, to any great extent" the assessments of Drs. Sharp, Vasavada, Baker, and McDaris.

## CONCLUSION

Reversal is warranted where the record is fully developed, and, upon the application of the correct legal standards, the claimant is entitled to benefits. *Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991). Based upon this court's evaluation of the evidence in the record and the submissions of the parties, the court finds that the record is fully developed and that the Commissioner did not apply proper legal standards in reaching his final decision. When the court applies the correct standard here, reversal is warranted with directions to award benefits. Accordingly, the decision will be reversed and remanded with such directions by separate order.

**DONE** and **ORDERED** this 15th day of March, 2013.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge